## No. XVIII.

### P. W. HERBERT v. THOMAS A. MOORE.

*Appeal from Travis County.*

JONES (WILLIAM J.), JUSTICE.—This case comes up upon a judgment rendered pro forma for the appellee in the court below.

The facts are in substance as follows: That on the night of the 27th of May, 1842, certain horses and mules were stolen from the plantation

---

one of several executors is sufficient to authorize suit. Deen v. Duffield, 8 T., 235. Failure to present claim within one year from appointment of administrator does not defeat action to foreclose lien. Phillips v. Mortgage

and possession of the appellant, in the county of Bastrop; and among them a mule, which is the subject of controversy. On the 30th of May of the same year, two days therafter, the mule was found in the possession of some Indians by the appellee and others (on a hunting excursion), about nine miles from the settlement on Brushy and thirty miles from Austin. They were all retaken after a skirmish, in which the appellee lost his horse.

It was admitted that the property belonged to the appellant at the time it was stolen, and that he demanded it of the appellee soon after its recapture from the Indians; but the restoration was refused upon the alleged ground that the taking and possession by the Indians, for more than *twenty-four hours,* divested the right and ownership of the appellant, and that the recapture vested the property of the mule in the recaptors, of whom the appellee was one.

The right preferred by the appellee to the property in question was based upon that principle of the law of nations known as the rule of post-liminy; which is defined to be the law under which property, if taken by an enemy in time of war, is restored to its former state upon coming again under the power of the nation to which it formerly belonged. This principle was recognized among civilized nations as essentially contributing to mitigate the calamities of war.

It appears, however, that movable property was not entitled by the strict rules of international law to the full benefit of post-liminy, unless retaken from the enemy soon after recapture; and the time necessary to vest an absolute title in the captors and to divest that of the original owner has been fixed at twenty-four hours. In some governments, the municipal laws have relaxed the rigor of this rule of limitation against the restoration of the property of the original owner, in case of recapture by their own citizens or subjects. There was no municipal regulation with us which applied in this case.

We do not consider it necessary to do more than state the principle here set up by the appellee, as in the very threshold a grave and important question is presented to us. We are first called upon to decide whether our courts of justice will apply the doctrines of international law to cases growing out of the predatory disturbances and desultory inroads made upon our frontier inhabitants by the savage and wandering tribes of Indians within the limits of the Republic? If they can not be so applied, a further inquiry into the laws of post-liminy will be unnecessary. It is barely questionable (if they can be so applied)

Co., 90 T., 195. When a lien claim is rejected, claimant may have judgment in district court for establishment of lien as well as debt. Cunningham v. Taylor, 20 T., 126; Perkins v. Sterns, 25 T., 561; George v. Ryon, 94 T., 317 (reversing George v. Ryon (T. C. A.), U. R. C., 1900); Jenkins v. Cain (T. Sup.), U. R. C., 1889. Presenting claim without presenting lien is sufficient presentation, though the better practice is to present both. Danzey v. Swinney, 7 T., 617; Cundiff v. Simpson, 32 T., 144; Cannon v. McDaniel, 46 T., 303; Mortgage Co. v. Jackman, 77 T., 622. Presenting claim alone is not waiver of lien. Ball v. Hill, 48 T., 634; Kempner v. Comer, 73 T., 196; Sutherland v. Elmendorf, 24 T. C. A., 137. In a contest between lien creditors, appellant can not on appeal object for first time that appellee's claim

whether, from the state of facts presented by the record in this case, the appellee could sustain his claim to the property in question. The rights of post-liminy do not attach in time of peace; and it is not alleged or shown that hostilities with these Indians were actually and continuously existing. Occasional border skirmishes can not be regarded as a regularly conducted war.

But if the present action could be safely disposed of on the ground just presented, it is still desirable that this question should be examined and settled upon the broad principle whether, if a state of war really existed, the same conventional rules of international justice which apply to civilized nations shall be extended by our courts of judicature to wandering savages, who have no fixed inhabitancy nor defined territorial limits. It is not controverted in the books that the law of post-liminy can only be applied to cases growing out of wars between *nations.* From the same authority, we are justified in saying that no community can be termed a nation which is not able to enforce its sovereign rights within some fixed territory—which is not independent of all other nations—which can not lay claim to nor exercise equal political rights with its neighbors or allies—and which does not profess to conform to all the obligations, universal in their sanction, imposed by the law of nations.

We will now examine how far these various attributes of sovereignty belong to the tribes of Indians in this Republic, and more especially those from whom the property in dispute was recaptured. They do not claim any territory as their fixed abode, nor attempt to enforce a sovereign authority over it. With one exception, assumed by some to have been made in favor of the Cherokees and their associates by the Mexican government, we know of no lands to which the Indians ever set up an absolute, indefeasible title within the limits of the Republic, as defined by the Act of December 19, 1836. No such title is claimed for the Indian tribes from whom the recapture of the property in dispute was made.

No territorial limits were ever assigned by the Mexican government to the various tribes of Indians in Texas; and if we look to the treaty of 1832, between Mexico and the United States, we will find that the former Republic then designated them as "Indian tribes," and not "Indian nations." In conformity with the views of the parent government, the Congress of Coahuila and Texas, in the ninteenth article of the colonization laws of 1825, have enacted, "that the Indians of all the *wandering* tribes within the limits of the State, who may wish to *establish* themselves in any of the settlements, after declaring themselves in

was not duly authenticated and presented, where administrator is not party to appeal. Watt v. White, 46 T., 338. Holder of vendor's lien note is not required to present claim to administrator of deceased indorser before bringing suit against maker to foreclose lien. Watt v. White, 46 T., 330.

**Note 57.**—Edwards v. Republic of Texas, p. 535.

An appeal does not lie in a criminal case, unless the appellant is in custody. Lowe v. State, 15 T., 141; Pate v. State, 21 T. App. 191.

favor of the institutions and religion of the government, shall be admitted as *settlers.*" If we look further on, we will find that by our Constitution and laws the Indians have been reduced to a level with free negroes and mulattoes.

The Indian tribes of Texas can not be regarded as independent of other nations, since they are under the control of this government; and their territorial limits may be extended or reduced as to the Congress may seem best. Nor has their independence or sovereignty been admitted by our sister Republic of the North. All the States of the Union where Indians were residing have held them in strict obedience to the laws, so far as public policy required. Chief Justice Marshall, in delivering his opinion in the Supreme Court of the United States on the final decision of the controversy between the Cherokee Nation and' the State of Georgia, places them, with .reference to the general government, in the same relation as that of the ward to his guardian; and after reciting the fact that those Indians occupied a territory to which the government of the United States asserted a title, decided, that "whilst they so resided within the limits of that government, they were in a state of *pupilage.*" And in continuation, "that they looked to the government for protection, and relied upon its kindness and power." The Indian tribes on our frontier stand necessarily in the same relation to this government; and although there may be occasional resistance, they are still subject to be controlled by the government. Their domestic dependence is no more discarded by a revolt against the authorities of the nation than the rights of the master are weakened or impaired by the open disobedience of the slave. The shackles of the one are not removed by opposition to the master, nor are the rights of the other enlarged by resistance to the government. They are still in a state of pupilage; and however fierce and sanguinary may be the opposition of the "wards," they must ultimately be brought, "to submit to the power and rely upon the kindness" of the "guardian."

But were the entire independence of the Indian tribes of Texas established beyond dispute, the conventional rules of the laws of nations could not still be applied to them. They are beyond the pale of civilization and can not be controlled in their conduct by conventional rules. As, for example, we find in Grotius (and copied by other writers upon this subject) that upon a recapture from pirates the property is restored to the original owner and does not, like a capture from an enemy in solemn war, change the title or divest the first proprietor of his right; nor does it require the application of the doctrine of post-liminy to

---

**Note 58.**—Whiting v. Briscoe and Harris, p. 540.

It is the cherished policy of the law of our State that its inhabitants only be sued in the county of their domicile, unless otherwise provided by statute; and suits brought in any other place may be met and resisted by plea in abatement. Rev. Stats. 1895, art. 1194; Chevallier v. Williams, 2 T., 239; Campbell v. Wilson, 6 T., 379; Henderson v. Kissam, 8 T., 46; Pool v. Pickett, 8 T., 122; Kinney v. McCleod, 9 T., 78; Finch v. Edmondson, 9 T., 504; Primrose v. Roden, 14 T., 1, 3; Blucher v. Milsted, 31 T., 621; Freeman v. Kuechler, 45 T., 592; Masterson v. Cundiff, 58 T., 472; Carro v. Carro, 60 T., 395;

restore it. Shall we apply these rules to pirates on land, or Indian robbers? Or will it be contended that the Indians rank higher than the pirates of the sea, or that they have ever conformed to those obligations of universal sanction imposed by the law of nations? Pirates subsist by robbery. And how do these Indian tribes, the Wacos and Comanches, live? And in what manner do they redress their supposed grievances? They are equally robbers with the pirates; and to avenge their imaginary wrongs, they have uniformly had recourse to rapine and bloodshed. Shall we then dignify them with the proud title of nationality, with whom we would be willing, if practicable, to cultivate the same relations of amity and intercourse as with England, France or the United States? Let us examine for one moment how mischievous this rule would be in its practical operation.

The rule of decision once established that twenty-four hours' possession by the robber would vest such a title in the recaptor that the original owner could not claim his property, and it would be to him a perpetual bar, as a recapture in that time, without miraculous intervention, could rarely ever take place; and all inducement for the despoiled owner to join in pursuit of the plunderers would be thus effectually withdrawn.

We can not acknowledge that the law of post-liminy can be as readily applied to Indians as to civilized governments without enforcing against our border population a most dangerous and unjust policy. These savages are regular depredators upon their property. The history of the bloody forays between them and our own citizens is recent and fresh in every mind, and the fact is referred to here simply to illustrate the danger of the application of these conventional rules of nations to property taken in the hour of midnight, by savage plunderers having no territorial limits, claiming no right of sovereignty over the soil, and living without any known form of government; whilst they set at defiance all the obligations held sacred and inviolable by civilized nations.

If recaptors of property from the grasp of the Indian robber were entitled to the full benefit of post-liminy, with its rigid and unqualified rule of limitation against the rights of the original owner, we should indirectly hold out inducements to the commission of the offenses against which the laws should provide a penalty. The depraved and discontented of all classes and nations would thus have a premium held out to them to encourage Indian robberies. If the property be stolen and removed one day's journey beyond the frontier, the ally of the Indians may there meet them, take possession of his share of the spoils,

---

Thomson v. Locke, 66 T., 383; Farris v. Seisfield, 1 App. C., sec. 351; Strohl v. Pinkerton, 1 App. C., sec. 470; Walthew v. Milby, 3 App. C., sec. 119; Fillman v. Hood, 3 App. C., sec. 191; Chamberlain v. Fox (T. C. A.), U. R. C., 1896. Objection to venue may be by special exception when it appears from the face of the petition that suit is brought in wrong county. Bigham v. Talbot, 51 T., 450; Masterson v. Cundiff, 58 T., 472; Carro v. Carro, 60 T., 395; De la Vega v. League, 64 T., 205; Watson v. Baker, 67 T., 48; Johnson v. Price, 2 App. C., sec. 756; Willis v. White (T. C. A.), U. R. C., 1895; K. C.

and claim to be a recaptor, entitled to the benefit of the law of post-liminy. What evidence could be furnished to show the conspiracy be-tween the plunderers and the recaptor? In this way the courts of jus-tice might often be invoked, ignorant of the fraud, to legalize the most daring and systematic game of plunder.

We can not therefore regard the present case in any other light than a robbery coming strictly within the rules of the municipal law, and which entitles the owner of stolen property, upon the establishment of his title according to the mode there pointed out, to be restored to his original rights.

We are of opinion that it was error in the district court to have entered up judgment for the defendant, and that the same should be reversed with costs.

*Reversed.*

Judge Morris says: "I concur in the result."